UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

LINDA SEIFERT, TIMOTHY SEIFERT,          :
AND LAURA SEIFERT                        :
Plaintiffs,                              :
                                         :
              v.                         :          CIVIL ACTION NO.
                                         :          3:10-cv-1326 (VLB)
ORLANDO RIVERA AND KENNETH               :
BORER,                                   :          MARCH 19, 2013
        Defendants.                      :


MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [Dkt. #20]

        The Plaintiffs Linda Seifert ("Linda"), Timothy Seifert ("Timothy"), and

Laura Seifert ("Laura") bring this action against City of Waterbury Detectives

Defendants Orlando Rivera ("Detective Rivera") and Kenneth Borer ("Detective

Borer"), alleging two federal law claims under 42 U.S.C. §1983 for unlawful entry

and seizure, and for false imprisonment, and one state law claim for negligent

infliction of emotional distress owing to the their home detention by the

Defendants while the officers awaited the issuance of a search warrant for the

home.  Before the Court is Defendants' motion for summary judgment as to all of

the Plaintiffs' claims.   For the following reasons, the Court GRANTS the

Defendants' motion for summary judgment.

        Facts

        The following facts are undisputed unless otherwise noted.[1]  Defendants

_____

[1] The Court notes before setting forth the factual background that Plaintiffs' Local
Rule  56(a)2 Statement in response to Defendants' Local Rule 56(a)1 Statement

Rivera and Borer were Waterbury Police Department Detectives. [Dkt. # 20-1, Local Rule 56(a)(1) Statement, ¶1].  On December 18, 2007 Michael Seifert ("Michael") husband of Plaintiff Linda Seifert and father of Plaintiffs Timothy Seifert and Laura Seifert, confessed to the Waterbury Police Department that he committed numerous bank robberies between the time period of February 2007 and December 2007. [Dkt. # 20-1, Local Rule 56(a)(1) Statement, ¶10]. Approximately thirteen of these bank robberies were committed in the State of Connecticut and in the State of New York, including an August 10, 2007 robbery of the TD BankNorth on 1254 W. Main Street in Waterbury. *Id.* at ¶3. Police investigations revealed that all of these bank robberies had a common suspect description and the same suspect vehicles, including a red Ford Expedition, a black Chevy Colorado, and an Oldsmobile Bravada. *Id.* at ¶3.

An investigation conducted by Detective David McKnight of the Waterbury Police Department of the August 10, 2007 robbery revealed that an individual by the name of Michael Seifert matched the physical description of the suspect of the numerous bank robberies, and that Michael Seifert also had access to all of the vehicles utilized by the suspect.  *Id.* at ¶3.  On December 17, 2007 Detective McKnight contacted the State of Connecticut Department of Motor Vehicles and obtained information for all 1998-2000 red Ford Expeditions registered in the State of Connecticut. [Dkt. # 20-3, Exhibit E, Aff. & Appl. for Search & Seizure

admits all of the factual allegations except one regarding whether consent was given by the Plaintiffs to enter and search their home.  The only evidence the Plaintiffs have proffered to create a genuine dispute as to the material fact of consent is Laura Seifert's deposition testimony.

Warrant, at 24]. Detective McKnight analyzed the list to determine whether any of the registered owners also had a black Chevy Colorado registered to their address, which led Detective McKnight to Michael Seifert's information. *Id.* Detective McKnight was able to obtain Michael Seifert's driver's license photo and compared it to the surveillance photos taken during the robberies, and determined the two had very similar characteristics. *Id.*

On December 18, 2007, the Plaintiffs and Michael Seifert resided at 69 Bonnie Vu Lane, in New Milford, Connecticut. [Dkt. # 20-1, Local Rule 56(a)(1) Statement, ¶¶5,6]. Waterbury Detectives traveled to the Seifert residence to inquire about Michael Seifert's whereabouts. *Id.* at ¶8. When detectives arrived at the Seifert residence they observed a black Oldsmobile Bravada in the driveway and interacted with Laura and Timothy Seifert. [Dkt. # 20-3, Exhibit D, Arrest Warrant Aff., at 20].  After talking to Timothy Seifert, the detectives drove to Michael Seifert's workplace in Windsor and located the red Ford Expedition that matched the description of the witnesses' reports. *Id.*

At approximately 4:00 p.m. on December 18, 2007, Waterbury Detectives transported Michael Seifert from his place of employment in Windsor to the Waterbury Police Department. [Dkt. # 20-1, Local Rule 56(a)(1) Statement, ¶9]. Michael Seifert provided a Voluntary Statement to the Waterbury Police Department confessing to the commission of the string of bank robberies in Connecticut and New York, including the bank robbery in Waterbury, Connecticut on August 10, 2007. *Id.* at ¶10.  In his statement, he admitted to using three vehicles that belonged to members of the Seifert household to commit the bank

robberies, including the red 1998 Ford Expedition which belonged to him, his son's black 2005 Chevy Colorado and his wife's 2000 Oldsmobile Bravada. *Id.* at ¶11; *see also* [Dkt. # 20-3, Ex. C, Michael Seifert Voluntary Statement, p. 11-13]. Michael Seifert also admitted that while he committed the bank robberies he wore sunglasses, a baseball cap, a jacket, a green windbreaker, a scarf, a button-down shirt, and a khaki coat.   [Dkt. # 20-1, Local Rule 56(a)(1) Statement, ¶12].   He further admitted to carrying a black laptop bag that contained a BB gun and bank teller demand notes. *Id.* at ¶12.   He stated that the black laptop bag and BB gun used in the robberies were still at his house, along with the clothing he used during the robberies. *Id.* at ¶13.   Defendants Detective Rivera and Detective Borer were asked by their supervisor to go to Michael Seifert's residence to stand by pending the issuance and to assist in the execution of a search and seizure warrant. *Id.* at ¶14. At about 5:30 p.m. the same day, Detectives Rivera and Borer left the Waterbury Police Department to travel to the Seifert residence. *Id.* at ¶14.

That same day Timothy Seifert left the Seifert residence at around 5:30 p.m. to pick up his mother, Linda Seifert, in the Oldsmobile Bravada. *Id.* at ¶16.   While Timothy Seifert drove to pick up his mother, Laura Seifert was present at the residence alone. *Id.* at ¶17.   Laura Seifert heard either the doorbell or knocking at the front door of the Seifert residence and opened the door. *Id.* at ¶18.

The Defendants contend that Laura Seifert opened the front door and was informed by Detectives Rivera and Borer that they were with the Waterbury Police Department and were waiting on a warrant for the house. *Id.* at ¶19.   At the time Laura was opening the door, she was holding onto the family dog as the dog was

4

trying to exit the house and when the Detectives shifted their weight, she physically backed up out of the open door space with the dog and moved back into the house allowing the Detectives to enter. *Id.* at ¶¶20-21.  After the Detectives entered, Laura shut the front door and the Detectives identified themselves to her and showed her a police badge.  *Id.* at ¶¶22-23.  Laura then asked the Detectives to sit in the living room until her mother came home.  *Id.* at ¶24.  The Defendants contend that they believed Laura consented to their entry into and presence at the home.

The Plaintiffs dispute that Laura consented to their entry and contend that the Officers used physical force to enter the residence. [Dkt. # 24-2, Pl.'s Rule 56(a)2 Statement, Disputed Issues of Material Fact, ¶¶1-2].  They rely exclusively on Laura's deposition testimony to create genuine disputes of material fact. Laura testified to the follow regarding her interaction with the Detectives:

> "Q: What happened?
> A: [I]t was either the doorbell or knocking, I'm not sure which, but two men were at my front door and made themselves known that way.
> Q; Okay. So I take it then you responded to the door and you opened the door?
> A: I did. I opened the door and I had to hold the dog because he was trying to get out, and Detective Borer and Rivera were at my front door. And as opposed to in the afternoon, they were now at the top of the front steps directly in front of me.
> Q: Okay. So at that time, you stated that you also were trying to keep the dog, and what kind of dog was it?
> A: He is a bearded collie.
> Q: And he's a large dog?
> A: He's about fifty-five pounds. So he comes just past my knees.
> Q: At that time when you opened the door and saw two men standing there, I assume, did they tell you who they were? Did they identify themselves?
> A: They said they were with the Waterbury Police Department and that they were waiting on a warrant for the house.
> Q: At that point in time, did they show you any badge?
> A: Not until they came into the house.

**Q: Can you describe for me how that happened? How did they come into the house?**

**A: I was bent over holding the dog; they're standing in front and above me. And they shifted their weight and came toward me. So I had to back up and they came into the house that way.**

**Q: And when they came into the house, where were they standing? Is there a foyer?**

**A: Yeah, in our front entryway.**

**Q: How about yourself at this time? What were you doing when they actually made it inside the house?**

**A: Once they came in the house, I shut the door so the dog couldn't get out.**

**Q: And then what happened?**

**A: At that time they identified themselves to me. One of them showed me a badge, and I asked them to sit in our living room until my mother came home.**

**Q: All right. And did they sit in the living room them?**

**A: They did." [Dkt. # 24-1, Laura Seifert's Dep., at 14-16].**

Laura asserts that when the police initially entered, they told her she could not call anyone. [Dkt. # 24-2, Pl.'s Rule 56(a)2 Statement, Disputed Issues of Material Fact, ¶5].   After asking the Detectives to sit in the living room, Laura went back into the kitchen to prepare dinner while the Detectives sat in the living room. [Dkt. # 24-1, Laura Seifert's Dep., at 16-17].   Laura testified that when she went back to the kitchen that "seemed to make [the Detectives] uncomfortable because you can't see the kitchen from the living room." *Id.*   Laura further testified that she was "allowed to stay in the kitchen at that time" while the Detectives stayed in the living room.  *Id.* at 17.

At the end of Linda Seifert's shift at 6:00 p.m., Timothy Seifert arrived at her place of employment, to pick her up and take her to their residence. [Dkt. # 20-1, Local Rule 56(a)(1) Statement, ¶27]. The drive from Linda Seifert's place of employment to the Seifert residence took approximately twenty minutes that day and when they arrived, Timothy Seifert drove up the driveway into the garage. *Id.*

at ¶27. A black Chevy Colorado pick-up truck was also parked in the garage at that time. *Id.* at ¶28. Timothy and Linda Seifert entered the house through the door in the garage and spoke to Laura Seifert, they then went to see Detectives Rivera and Borer who were still sitting in the living room. *Id.* at ¶29.  Linda Seifert asked the Detectives why they were there and Detective Rivera responded that they were there to secure the house in advance to the issuance of a search warrant and that her husband Michael Seifert was at the Waterbury Police Department. *Id.* at ¶30. The Plaintiffs claim that they asked whether they could leave the house, and they were told by the Detectives that they could not leave the house. *Id.* at ¶31. Timothy Seifert had nowhere specifically to go that evening and had no pre-made plans that evening. *Id.* at ¶32. Linda Seifert did not have pre-made plans to go anywhere that evening either. *Id.* at ¶33. Laura Seifert had plans and asked the Detectives if she could leave the house to go to the movies with a friend that night.  *Id.* at ¶34.  She was told she could not leave the house nor was she allowed to call her friend to cancel the plans. *Id.* at ¶34. However, Laura Seifert text messaged her friend to inform her that she was not able to meet with her that night. *Id.* at ¶34. During the time that Detectives Rivera and Borer were inside the Plaintiff's house Laura, Timothy and Linda Seifert were in possession of a cell phone. *Id.* at ¶¶35, 36, 37. Timothy and Linda Seifert did not ask to use their cell phones. *Id.* at ¶¶36, 37. There was also a landline phone in the kitchen of the house. *Id.* at ¶38.

During the period Defendants Detective Rivera and Borer were in the Plaintiffs' house, Linda Seifert asked Detective Borer if she could go upstairs to

the second floor and change her clothing. *Id*. at ¶39. Linda Seifert was given permission to do so, and then went upstairs alone and changed her clothing. *Id*. at ¶39.  She also had access to the bathroom facilities and utilized them. *Id*. at ¶39. Linda Seifert also went from the family room to the kitchen to get a glass of water. *Id*. at ¶39. During this time period, Plaintiff Timothy Seifert also had free access to the bathroom and kitchen and used them both. *Id*. at ¶40.  During the period Detectives Rivera and Borer were in the Seifert residence, Linda, Timothy and Laura Seifert went into the family room to sit together and talk, while the Detectives remained in the living room. *Id*. at ¶41.  While the Plaintiffs sat together in the family room they turned on the television. *Id*. at ¶41. Laura Seifert states that she watched the New York Rangers hockey game to distract herself. [Dkt. # 20-5, Exhibit Q, Pls.' Resp. to Def.'s Interrog. No. 5, at 60].

At 7:34pm that same night, Michael Seifert's Voluntary Statement was completed and the police prepared an arrest warrant for him along with two Search and Seizure Warrants. [Dkt. # 20-1, Local Rule 56(a)(1) Statement, ¶42]. At 9:32 p.m. the Arrest Warrant and the two Search and Seizure Warrants were signed by a Judge of the Connecticut Superior Court. *Id*. at ¶42.  At approximately 10:38 p.m., Michael Seifert was arrested at the Waterbury Police Department and formally charged with the robbery of TD Banknorth in Waterbury, Connecticut. *Id*. at ¶45.

Between 9:30 p.m. and 11:00 p.m. Detectives Rivera and Borer went into the family room and told Linda, Laura, and Timothy Seifert that Michael Seifert was in custody at the Waterbury Police Department and had confessed to the

commission of bank robberies and that a search warrant had been secured. *Id*. at ¶46. During this conversation, the Plaintiffs asked if they could use one of the cars to leave the house and Detective Rivera responded that the other cars in the garage had also been used in the robberies and had to be impounded. *Id*. at ¶47. Before the Oldsmobile Bravada was impounded, Timothy Seifert asked if he could remove some personal items from the vehicle and was allowed to do so. *Id*. at ¶49.

At 11:00 p.m. the Search and Seizure Warrants were executed at the Seifert residence. *Id*. at ¶50.   Timothy Seifert went to sleep inside the house at approximately 1:00 a.m. on December 19, 2007 while Detectives Rivera and Borer were still present along with other police officers from other jurisdictions and the crime scene technicians. *Id*. at ¶51.   Laura Seifert also fell asleep in the house during the time the Search Warrant was in the process of being executed. *Id*. at ¶52. During the time Detectives Rivera and Borer were inside the Seifert Residence on December 18, 2007 they were never told to leave the residence by the Plaintiffs nor did the Plaintiffs ever request them to leave the residence.  *Id*. at ¶53.

### Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106

(2d Cir.2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.,* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D.Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record,

summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

<u>Analysis</u>

I.      Unlawful Entry

The Plaintiffs argue that the Defendants unlawfully entered their residence as they had not obtained consent to enter.  The Fourth Amendment gives an individual the right to be "free in one's home from unreasonable searches and arrests."  *Pearson v. Callahan,* 555 U.S. 223, 230 (2009) (quoting *Callahan v. Millard Cty.,* 494 F.3d 891, 898–899 (2007)).  A warrantless entry to a home is per se unreasonable unless it satisfies the established exceptions. *Id.*  Two exceptions allow police officers to enter the home without a warrant (1) in the case of exigent circumstances or (2) when consent is given.  *Id.*  Although the Plaintiffs contend that Laura Seifert did not give consent for the Detectives to enter the residence, the Court finds that either of these two exceptions applicable in the present case to render the Detectives' entry into the Seifert residence lawful under the Fourth Amendment.

A.      Consent

The Fourth Amendment prohibits searches that are objectively unreasonable, and in the context of a purported consent to search the determining question is whether, "based on the totality of the circumstances, 'the officer had a reasonable basis for believing that there had been consent to the search.'" *Felmine v. City of New York*, 09-CV-3768 CBA JO, 2011 WL 4543268, *15 (E.D.N.Y. Sept. 29, 2011) *recons. den.,* 09-CV-3768 CBA JO, 2012 WL 1999863

(E.D.N.Y. June 4, 2012)(quoting *United States v. Garcia,* 56 F.3d 418, 423 (2d Cir.1995)).  Furthermore, "[c]onsent must be freely and voluntarily given." *Abdella v. O'Toole*, 343 F. Supp. 2d 129, 134 (D. Conn. 2004) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)).   In addition, consent is not merely acquiescence in the presence of lawful authority. *Garcia*, 56 F.3d at 422.

The Second Circuit has further explained that "[r]ecent Supreme Court decisions emphasize both that only unreasonable searches are proscribed by the Fourth Amendment, and that the issue of reasonableness is to be measured by an objective standard." *Garcia*, 56 F.3d at 423.  As the Second Circuit highlighted, the Supreme Court has stated that:

> It is apparent that in order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or *the police officer conducting a search or seizure under one of the exceptions to the warrant requirement*—is not that they always be correct, but that they always be reasonable.

*Illinois v. Rodriguez*, 497 U.S. 177, 186-86 (1990) (emphasis added).  Therefore, "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).  And thus, "[t]he Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent

permitted him to [conduct the search that was undertaken]." *Id.* at 249.  "Of course, this objective standard does not preclude an assessment of the particularities of the situation that is presented in any given case.  On the contrary, it is still the totality of the circumstances that must be considered." *Garcia*, 56 F.3d at 423.  "Nonetheless, the ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'"  *Id.* (quoting *U.S. v. Sanchez*, 32 F.3d 1330, 1334-35 (8th Cir. 1994)).

    Based on the totality of the circumstances in this case Detectives Rivera and Borer had a reasonable basis for concluding there was consent to enter.  The Second Circuit has consistently held that consent need not be express but may be implied from "an individual's words, acts or conduct."  *Krause v.Penny*, 837 F.2d 595, 597 (2d Cir.1988).  "Thus a search may be lawful even if the person giving consent does not recite the talismanic phrase: You have my permission to search." *U.S. v. Grant*, 375 F. App'x. 79, 80 (2d Cir. 2010) (internal quotation marks and citation omitted).   As recounted by Laura Seifert herself, she backed up after the officers shifted their weight as she restrained the dog.   When the officers followed her into the entryway, she shut the door after learning that they were policemen and then asked them to sit in the living room until her mother came home.  [Dkt. # 24-1, Laura Seifert's Dep., at 14-16].  Even viewing this testimony in the light most favorable to the Plaintiffs, the Detectives had a reasonable basis to interpret Laura Seifert's conduct of stepping back allowing room for them to enter, shutting the door after they entered and asking them to sit in the living

room until her mother arrived home as an invitation to enter and remain at the home absent any vocal or other indication to the contrary.

The Plaintiffs attempt to create a genuine issue of material fact in dispute by focusing on Laura's intent, arguing that Laura's conduct in stepping back from the open door was not an invitation to enter the residence but done because she was holding onto the family dog and in response to the Detectives' shifting their weight. The inquiry under the Fourth Amendment is one of objectiveness reasonableness, the standard for measuring consent is not the occupant's intent but rather whether "a typical reasonable person have understood by the exchange between the officer and the [occupant]" that consent was given. *Jimeno*, 500 U.S. at 251. Further, police officers need not always be correct under the Fourth Amendment, they only need to be reasonable. *Illinois*, 497 U.S. at 186-86. In view of the totality of the circumstances, it was objectively reasonable for the Detectives to believe that Laura Seifert had consented to their entry when she stepped backwards from the open door even if that wasn't her intent and further that she invited them to remain at least until her mother came home.

In addition, the Plaintiffs argue that consent could not have been given because the Detectives used forced to enter the home as evidenced by the fact that they shifted their weight which prompted Laura to back up. [Dkt. # 24, Pl.'s Mem. in Opp'n to Def.'s Motion for Summ. J., at 2.]. Even viewing these facts in the light most favorable to the Plaintiffs, a reasonable person would not conclude based on this exchange that the Detectives employed force to enter the residence. For example, there is no evidence that the Detectives lunged at the

**14**

door, obstructed the doorway to prevent closing, had any physical contact with Laura or the door or even that the Officers took any actual steps forward to proceed through the doorway.   Even in viewing Laura Seifert's testimony in the light most favorable to her, it was objectively reasonable for the Detectives to believe that their conduct in shifting their weight had not coerced her into allowing them into the residence.   Even if the Detectives' shifting of weight could be construed as force, the fact that a person "has been subjected to a display of force does not automatically preclude a finding of voluntariness." *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006) (citing *United States v. Ansaldi,* 372 F.3d 118, 129 (2d Cir.2004) (holding that use of guns to effectuate arrest and handcuffing of defendant did not render his consent to search his home involuntary)).   Again as the standard to be used here is the reasonableness of the officer's belief that there was consent, the fact that Seifert might have moved backward in response to the Detective's shifting their weight does not preclude a finding that the Detectives' reasonably perceived her conduct in moving backwards as consent to enter as opposed to her simply responding to their shifting of weight.

Given the totality of the circumstances, a typical reasonable person would have understood that Laura's nonverbal communication and subsequent actions indicated her consent for the Defendants to enter and remain in the house. *See,e.g., U.S. v. Grant*, 375 F. App'x. 79 (2d Cir. 2010) (finding there was implied consent where occupant admitted officers into his building and turned towards his apartment, the officers followed occupant into his apartment without any

impediment or objection to their entry); *United States v. Zabala,* 52 F.Supp.2d 377, 385 (S.D.N.Y.1999) (defendant consented to search of her apartment when police asked her if "we can take a look inside" and defendant unlocked and opened her door); *United States v. Wilson,* 895 F.2d 168, 172 (4th Cir.1990) (individual consented to search of his person by shrugging his shoulders and extending his arms); *compare Felmine v. City of New York*, 09-CV-3768 CBA JO, 2011 WL 4543268, *16 (E.D.N.Y. Sept. 29, 2011) (finding triable issue of fact as to whether consent was given where plaintiff testified that officers followed her into the residence after she had turned her back in an attempt to close the door).  Here, Laura Seifert did not attempt to close the door nor did she object to the Detectives' entry when they came in.  In addition, the reasonableness of the Detectives' belief that consent had been given is further bolstered by the undisputed facts that after they had walked through the doorway, Laura Seifert closed the door behind them and asked them to sit in the living room.

Lastly, the Plaintiffs contend that the fact that Laura Seifert was silent and did not object to the Detectives' presence does not constitute consent.  The Plaintiffs are correct that "mere silence or the failure to object does not constitute consent unless the totality of circumstances so indicates." *United States v. Taylor*, 279 F.Supp.2d 242, 245 (S.D.N.Y. 2003).  However, as discussed above the totality of the circumstances did indicate that the Officers had a reasonable basis for believing there was consent when they proceeded into residence after she had backed up, particularly given her contemporaneous invitation for them to sit in the living room.  It is well established that the validity of an entry or search of a

home does not depend on the recitation of any talismanic phrase. Moreover, Laura Seifert did utter a talismanic phrase to the Officers shortly after they walked through the doorway asking them to sit in the living room. Even viewing the facts in the light most favorable to the Plaintiffs, the Detectives had a reasonable basis for believing that Laura Seifert had given consent for their entry into the residence and therefore the Court finds that their warrantless entry was reasonable under the Fourth Amendment.

Although not raised or disputed by the parties, it appears that Laura Seifert had authority to give consent for the Detectives to enter the Seifert residence. Consent to search property may be given by the owner of the property or from a third-party who possesses "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Abdella,* 343 F. Supp. 2d at 134 (quoting *United States v. Matlock,* 415 U.S. 164, 171 (1974)). Here, Laura Seifert had authority over the residence or other sufficient relationship to give consent as Laura testified that she resided at the Seifert Residence at the time of the incident. [Dkt. # 24-1, Laure Seifert Deposition., at 6.]. She further testified that she had graduated from high school over a year and a half prior to the incident and was a college student at the time. *Id.* at 8. In view of the fact that Laura was not a minor and resided at the premises, it was reasonable for the Defendants to believe she had the authority to consent to their entry. Moreover, Laura's mother, Linda Seifert, clearly acquiesced to the Detectives' presence inside the home when she arrived back at the residence. According to Linda Seifert's deposition she arrived home and asked why the Defendants were in her

17

home, and the Detectives told her that they were waiting on a warrant. Dkt. #20-5, Ex. M, Linda Seifert's Dep.,p. 40]. Linda Seifert did not object to their presence in her house nor did she ask them to leave at any point. [Dkt. # 20-1, Local Rule 56(a)(1) Statement, ¶53].  She testified that when she came home she spoke to the officers and then watched television in the family room while the officers stayed in the living room as Laura Seifert had asked them.  For the aforementioned reasons, summary judgment in favor of the Defendants is warranted as the Defendants' warrantless entry was not unreasonable under the Fourth Amendment.

### B.    Exigent Circumstances

Assuming arguendo that the Defendants did not have consent to enter the Seifert residence, Defendants' entry to the home was lawful because of the exigent circumstances in this case.  A warrantless entry to a home is lawful when exigent circumstances exist. *See Pearson,* 555 U.S. at 230.  One well established exigent circumstance is the need to prevent the imminent destruction of evidence. *Kentucky v. King*, 131 S. Ct. 1849, 1852 (2011)[2]; *Abdella*, 343 F.Supp. 2d at 139 (citing *United States v. Brown*, 52 F.3d 415, 421 (2d Cir. 1995)).  The central requirement in determining whether exigent circumstances justify a warrantless

---

[2] The Supreme Court in *Kentucky* v. King recently reaffirmed that the need to prevent the imminent destruction of evidence is a sufficient justification for a warrantless search but further clarified that the "exigent circumstances rule applies when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment."  131 S.Ct. at 1862.  Here as this Court has held that the seizure and search of the Plaintiffs and their residence did not violated the Fourth Amendment, the exigent circumstances rule would apply to justify the Detective's conduct in entering the home even if there had not been consent and their subsequent actions in securing the premises until the search warrant was obtained.

entry is whether the police officers had an "'urgent need' to render aid or to take action." *Rogers v. Apicalla*, 606 F.Supp.2d 272, 286 (D. Conn. 2009) (citing *United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir.1990)).  "The test for determining exigent circumstances is an objective one that turns on the totality of the circumstances confronting law enforcement agents in a particular case." *Abdella*, 343 F.Supp. 2d at 139.  The Second Circuit has identified six factors that should be considered when determining the existence of exigent circumstance:

> (1) the gravity or violent nature of the offense the suspect allegedly committed; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause that the suspect committed the crime; (4) strong reason to believe the suspect is in the premises being entered; (5) a likelihood the suspect will escape if not swiftly captured; and (6) the peaceful circumstances of the entry.

*Id.* (citing *MacDonald*, 916 F.2d at 769-770).  In addition, "a reasonable belief by law enforcement officials that the targets of an investigation are armed or that quick action is necessary to prevent the destruction of evidence can serve to show exigent circumstances."  *Id.*  These factors are "'merely illustrative, not exhaustive, and the presence or absence of any one factor is not conclusive.'" *Id.* (quoting *MacDonald*, 916 F.3d at 770).   "Sometimes the presence of a solitary factor suffices" such as the destruction of evidence in particular.  *MacDonald*, 916 F.2d at 770 (citing *United States v. Gallo-Roman*, 816 F.2d 76, 79-80 (2d Cir. 1987)).

Consideration of these factors indicate that that there were exigent circumstances justifying the Officer's warrantless entry into the Seifert residence to prevent the destruction of evidence that supported Michael Seifert's conviction of a string of armed robberies throughout two states.  First, the gravity of the

offenses that Michael Seifert was to be charged was serious, he committed thirteen armed robberies over the span of ten months. [Dkt. # 20-1, Local Rule 56(a)(1) Statement, ¶10].  In addition, there is a clear showing of probable cause to believe that Michael Seifert committed the crime on the basis of his confession.  Further, the Officers had probable cause to believe that evidence of Michael Seifert's crimes were within the residence because he had told the police the clothing, BB gun, and bag he used during the robberies were at his home and the Officers' had observed one of the cars that was used in the robberies at the residence.  Next, there was a likelihood that the occupants of the residence could escape with the evidence, such as the vehicles, as such property was not secured. The other residents of the home were immediate family members of Michael Seifert and as such had a motive to destroy or conceal evidence of the crimes.  Michael Seifert also confessed to using his family members' cars, which made them potential accomplices or co-conspirators of the crimes, increasing their motive to destroy or conceal evidence.  Moreover, the entry was eminently peaceful as the Detectives knocked on the door, waited for Plaintiff Laura Seifert to answer and politely spoke to her and peacefully entered the home.   The Detectives then waited in the living room as directed to secure the residence and deter the destruction of any evidence while waiting for the search warrant.   The Detectives allowed the Plaintiffs to use the kitchen to make dinner, use the bathrooms, and watch television together in the family room and go to sleep at night.

Lastly, quick action was needed to prevent the destruction of evidence. The Defendants were unaware of who was complicit in the bank robberies and therefore were justified in securing the property for the preservation of evidence. At the time the Defendants were sent by their supervisors to the Seifert residence, they were not informed as to whether Michael Seifert acted alone in committing the robberies or what kind of evidence was going to be essential to the prosecution of Michael Seifert and perhaps other family members.  It was further reasonable to suspect that other members of the Seifert family may have been involved in the robberies as Seifert admitted to using his wife and his son's cars during the robberies.  Further, given that the police department had visited the Seifert residence earlier that day, they had put the family on notice that Michael Seifert was being sought by police.  In light of these circumstances, it was reasonable for the Defendants to anticipate that any member of Seifert's family would destroy evidence as they had been alerted that their father's bank robbery scheme had been uncovered by the police.  *See U.S. v. Gallo-Roman*, 816 F.2d at 79 (finding that DEA agents' belief that evidence might be destroyed was not mere speculation because it was reasonable for DEA agents to conclude that once suspects had been alerted that their scheme had been uncovered that they would attempt to destroy evidence.).  Consequently, the possible destruction of evidence at the Seifert residence was imminent and therefore it was reasonable for the police officers to enter the Seifert residence, even in the absence of consent, to preserve evidence.  Even if consent had not been obtained, the

Defendants did not violate the Fourth Amendment by entering the Seifert

residence without a warrant to secure the premises.

## II.    False Imprisonment

The Plaintiffs argue that the Defendants' conduct in detaining them in their

home while waiting to obtain the search warrant and then executing the search

warrant amounted to false imprisonment.  When analyzing a false imprisonment

claim courts look to the law of the state in which the arrest occurred. *Russo v.*

*City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (citing *Davis v. Rodriguez,* 364

F.3d 424, 433 (2d Cir.2004)).[3]  Under Connecticut law "'[f]alse imprisonment, or

false arrest, is the unlawful restraint by one person of the physical liberty of

another.'" *Id.* at 204 (quoting *Outlaw v. City of Meriden,* 43 Conn.App. 387, 392,

682 A.2d 1112, 1115 (1996)).  "To prevail on a claim of false imprisonment, the

plaintiff must prove that his physical liberty has been restrained by the defendant

and that the restraint was against his will, that is, that he did not consent to the

restraint or acquiesce in it willingly." *Zainc v. City of Waterbury*, 603 F.Supp.2d

368, 386 (D. Conn. 2009) (quoting *Berry v. Loiseau,* 223 Conn. 786, 820, 614 A.2d

414 (1992)).   "The restraint must be accomplished through the exercise of force.

A person is not liable for false imprisonment unless his act is done for the

purpose of imposing a confinement, or with knowledge that such confinement

---

[3] Although it is unclear whether the Plaintiffs' claims are brought under §1983 or
solely under Connecticut law or both, it is immaterial as the analysis of false
imprisonment is the same under §1983 and Connecticut law.  *Zainc v. City of
Waterbury*, 603 F.Supp.2d 368, 386 n.7(D. Conn. 2009)

will, to a substantial certainty, result from it." *Id.* (internal quotation marks and citations omitted).

"In the case of a false imprisonment the detention must be wholly unlawful ...." *Lo Sacco v. Young,* 20 Conn.App. 6, 19 (1989) (internal quotation marks and citations omitted). "A Section 1983 claim for false arrest or false imprisonment 'rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures.'" *Oliphant v. Villano,* No. 3:09cv862 (JBA), 2011 WL 3902741, at *1 (D. Conn. Sept. 6, 2011) (quoting *Weyan v. Okst,* 101 F.3d 845, 852 (2d Cir.1996)). Consequently, a "seizure permissible under the Fourth Amendment is not 'unlawful' and therefore cannot sustain a claim of false imprisonment." *Hamilton v. City of New Haven,* 213 F.Supp.2d 125, 133 (D. Conn. 2002) (citing *Smith v. City of New Haven,* 166 F.Supp.2d 636, 645 (D.Conn.2001) (arrest supported by probable cause under the Fourth Amendment is not unlawful)). The Defendants argue that the Plaintiffs cannot establish that their detention was wholly unlawful as it was permissible under the Fourth Amendment to detain them while waiting to obtain and then executing a search warrant. The Defendants argue both that the seizure of the Plaintiffs and their residence was reasonable under the Fourth Amendment.

"The Fourth Amendment's protection against unreasonable searches and seizures applies to all seizures of the person, including those that involve only a brief detention short of traditional arrest." *U.S. v. Bews*, 715 F.Supp. 1206, 1209 (W.D.N.Y. 1989) (citing *Brignoni-Ponce*, 522 U.S. 873, 878 (1976). The brevity and the exigency of the circumstances may permit a detention for investigative

purposed on reasonable suspicion. *Terry v. Ohio*, 392 U.S. 1, 16-19 (1968);  *Brown v. Texas,* 443 U.S. 47, 51 (1979) (police may detain a suspect for further investigation upon reasonable suspicion of criminal wrongdoing).  *Terry* requires that a police officer have only "reasonable suspicion," *United States v. Scopo,* 19 F.3d 777, 781 (2d Cir.1994), that "criminal activity may be afoot" to justify an investigatory stop.  Reasonable suspicion requires considerably less of a showing than probable cause. *See United States v. Arvizu,* 534 U.S. 266, 273, (2002).  Here, based on the totality of the circumstances, the officers had a reasonable basis to suspect that other members of the Seifert family were complicit in the string of 13 armed bank robberies committed my Michael Seifert in the prior 10 months.  First, the number and frequency of the crimes as well as his absence at the times they were committed may have alerted them as they resided with him. Second, he wore the same clothing and used the same implements to commit each crime and stored them in the home where they resided.  Third, he used his family members' vehicles to commit the crimes. Finally, he stated that he robbed the banks because he needed money and his family may well have realized he had more money than he earned legally.  The court must consider these facts in the aggregate and not in isolation. *United States v. Cortez,* 449 U.S. 411, 418 (1981) ("[T]he assessment must be based upon all the circumstances .... and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.").  Indeed, some courts have found detention sustainable in circumstances that are not dissimilar to from the facts of this case, where the detainee is closely associated

with a person suspected of committing a crime. S*ee United States v. Barlin,* 686 F.2d 81, 87 (2d Cir.1982) (holding that the search and detention of the defendant was justified by reasonable suspicion because she "was not innocuously present in a crowd at a public place" but, instead, "entered [the apartment] in tandem with [suspects] whose involvement in an ongoing narcotics transaction seemed apparent"); *United States v. Tehrani,* 49 F.3d 54, 59-60 (2d Cir.1995) (holding that a *Terry*-stop of the defendant at an airport was justified by reasonable suspicion regarding his traveling companion and inconsistencies between statements made by the defendant and statements made by his companion in response to questions posed by law enforcement agents).

Further, the preservation of evidence alone is sufficient to justify the minimal intrusion on the Plaintiffs.  It is well established that a search warrant "carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers,* 452 U.S. 692, 705 (1981); *see also Muehler v. Mena,* 544 U.S. 93, 98 (2005).  The Supreme Court has explained that an "officer's  authority to detain incident to a search is categorical and does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure" *Muehler*, 544 U.S. at 98 (internal quotation marks and citation omitted).   Further, where there is probable cause "[t]he connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant."  *Summers*, 452 U.S. at 703-04.

The Supreme Court has suggested that even in the absence of a warrant, a temporary seizure supported by probable cause and exigent circumstances to prevent the destruction of evidence while the police diligently obtain a warrant is reasonable under the Fourth Amendment.   In *Summers*, the Supreme Court acknowledged that "[t]he fact that our holding today deals with a case in which the police had a warrant does not, of course, preclude the possibility that comparable police conduct may be justified by exigent circumstances in the absence of a warrant." *Summers*, 452 U.S. at 703 n.17.  Then in *Segura v. United States*, 468 U.S. 796 (1984), the Supreme Court held that "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." *Id.* at 810.   They concluded that under circumstances where the securing of premises is "undertaken to preserve the status quo while a search warrant is being sought" that will not violate the Fourth Amendment.  *Id.* at 809.  In coming to this conclusion, the Supreme Court considered and relied on its prior decision in *Rawlings v. Kentucky*, 448 U.S. 98 (1988) where it did not question the admissibility of evidence discovered pursuant to a later issued warrant where "officers secured, from within, the home of a person for whom they had an arrest warrant, and detained all occupants while other officers were obtaining a search warrant."  *Id.* (citing *Rawlings*, 448 U.S. at 100).

As the Supreme Court in *Summers* contemplated that where there are exigent circumstances, such as the need to prevent the destruction of evidence,

police officers may have the limited authority to detain occupants incident to a search absent a warrant.  "It is well established that 'exigent circumstances,' including the need to prevent the destruction of evidence, permit police officers to conduct an otherwise permissible search [or seizure] without first obtaining a warrant." *Kentucky v. King*, 131 S.Ct. 1849, 1853-54 (2011).  Therefore, reading *Summers* and *Segura* together indicates that it would not violate the Fourth Amendment to temporarily seize either a dwelling or any occupants of that dwelling on the basis of probable cause to prevent the destruction or removal of evidence while a search warrant is diligently sought.  Indeed, the Second Circuit has suggested that the rationale of *Segura* "would permit minimal restraint upon bystander occupants of premises to prevent them from destroying evidence or otherwise interfering with a search" while waiting to obtain a warrant.  *Ayeni v. Mottola,* 35 F.3d 680, 690 n. 13 (2d Cir.1994) *abrogated on other ground by Wilson v. Layne,* 526 U.S. 603 (1999).

After *Summers* and *Segura*, the Supreme Court held that there was no unreasonable seizure where police officers, who had probable cause to believe a suspect had hidden marijuana in his home, prevented that suspect from entering his residence unaccompanied by an officer for about two hours while they obtained a search warrant.  *Illinois v. McArthur*, 531 U.S. 326 (2001).  The Supreme Court emphasized that "[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable."  *Id.* at 330 (citing *Summers*, 452 U.S. at 702-705).

27

They explained that a warrantless seizure is not *per se* unreasonable and "rather than employing a *per se* rule of unreasonableness, [courts should] balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable." *Id.* at 331.  The Supreme Court further emphasized that "[w]e have found no case in which this Court has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time" and in particular highlighted that "[i]n various other circumstances, this Court has upheld temporary restraints where needed to preserve evidence until police could obtain a warrant." *Id.* at 334.

In *McArthur*, the Supreme Court examined four factors in determining the reasonableness of the seizure which seek to balance privacy-related and law enforcement-related concerns: (1) probable cause to believe the home contained evidence of crime and contraband; (2) good reason to fear that evidence would be destroyed before they could return with a warrant; (3) reasonable efforts to reconcile law enforcement needs with right of personal privacy; and (4) restraint for limited period of time. *Id.* at 331-33.  Moreover, any restraint imposed must be "both limited and tailored reasonably to secure law enforcement needs while protecting privacy interests" to satisfy the reasonableness requirement under the Fourth Amendment.  *Id.* at 337.  These factors identified in *McArthur* comport with both the Supreme Court's direction in *Summers* that detaining occupants incident to a search may be permissible in the absence of a warrant where there are exigent circumstances and their holding in *Segura* that securing the premises

on the basis of probable cause to prevent destruction of evidence while obtaining a search warrant does not violate the Fourth Amendment. *See e.g., U.S. v. Yett*, 85 F. App'x 471, 474 (6th Cir. 2004) ("Reading *Summers* and *McArthur* together" to conclude that officers' temporary detention of suspect for one hour while awaiting the issuance of a search warrant was permissible because the temporary detention was supported by probable cause and "seizure prior to the warrant's issuance was calculated to prevent the loss of evidence and freeze the status quo" and police were diligently obtaining a warrant that was quickly granted."); *U.S. v. Pignard*, No.06cr718(CM), 2007 WL 431863, at *5 (S.D.N.Y. Feb. 6, 2007) (holding that under *McArthur* and *Segura*, the officers "did nothing wrong by entering and securing the apartment while waiting for the warrant to issue" and emphasizing that [i]t is also well settled that [police officers] can detain persons at a crime scene while waiting for a warrant or conducting a search, even if those persons are not otherwise suspected of committing crimes."); *United States v. Legette*, 260 F. App'x 247, 251 (11th Cir. 2008) (upholding denial of motion to suppress where officer detained individual in a residence for three to four hours pending a search warrant"); *Chin v. Wilhelm*, No.CCV-02-1551, 2006 WL 827343, at *6 (D.Md. Mar. 24, 2006) (finding that the "principle articulated in *Summers* has been extended to those situations where, as here, the police detain individuals while they seek a warrant to search the premises") (citing *McArthur*, 531 U.S. 326); *Hearn v. Secretary, Dept. of Corrections*, No.3:07-cv320, 2010 WL 1462365, at *8 (M.D.Fla. April 13, 2010) (Under *McArthur* and *Segura*, "[o]nce they had probable cause to search the premises, the officers could detain the

individuals until they obtained a warrant; could arrest the individuals for possession of the drug and then obtain a warrant; or obtain consent to enter the premises."); *see also* Gordon Mehler, John Gleeson & David C. James, *Federal Criminal Practice: Second Circuit Handbook,* 44-9 ( 12th ed. 2012) ("If a search warrant is in the process of being obtained officers may detain the occupants of a residence for a reasonable time to preserve the statue qui.") (citing *Segura* and *McArthur*).

The Plaintiffs argue that it is not appropriate to apply the holding in *McArthur* to the present case because in *McAthur* the detention occurred outside the home and the occupant was only permitted to enter the home accompanied by an officer whereas here the Plaintiffs were detained inside the home and not permitted to leave.   However, this is a distinction without a difference favoring the Plaintiffs' position.  The restraint here is less onerous than the one in *McAthur*  because in *McAthur*  the detainee was denied access to his home and the Plaintiffs were allowed unfettered use of their home.  In addition, here the officers reasonably believed that there was consent to enter and remain in the home in the first instance and the officers reasonably feared that the Plaintiffs would leave the residence with evidence – namely their cars which Michael Seifert had confessed he used to commit his string of armed bank robberies.  See *United. Legette*, 260 F. App'x at 251 ("Although in *McArthur* the detention occurred outside the home and here Legette was detained inside his home, this distinction is not dispositive where the defendant granted permission to the officers to enter his home.").  The Court therefore finds the *McArthur* factors

appropriate to consider in determining whether the Officers' detention of the Plaintiffs while waiting to obtain a search warrant was reasonable under the Fourth Amendment.  These factors are appropriate to consider in both examining whether the "seizure" of the Plaintiffs as well as the "seizure" of their home by the Defendants prior to obtaining the search warrant was permissible under the Fourth Amendment as such factors purposefully balance the privacy-related and law enforcement-related concerns central to the Fourth Amendment inquiry.  *See McArthur*, 531 U.S. at 330 (the Fourth Amendment's "'central requirement' is one of reasonableness.  In order to enforce that requirement, this Court has interpreted the Amendment as establishing rules and presumptions designed to control conduct of law enforcement officers that may significantly intrude upon privacy interests") (citation omitted); *Lauro v. Charles,* 219 F.3d 202, 209 (2d Cir. 2000) ("Thus, a Fourth Amendment examination of a search or seizure like the one in this case requires a contextualized reasonableness analysis that seeks to balance the intrusion on privacy caused by law enforcement against the justification asserted for it by the state.")  (citing *Graham v. Connor,* 490 U.S. 386, 396 (1989)).

       An application of the *McArthur* factors to the present case indicates that the restraints imposed on the Plaintiffs and their residence while the Defendants diligently sought and obtained a search warrant were reasonable under the Fourth Amendment.   First, Defendants Detectives Rivera and Borer had probable cause to believe that the Seifert residence contained evidence of the thirteen bank robberies committed by Michael Seifert throughout the state of Connecticut

and New York.  "Whether probable cause existed is a question that may be resolved as a matter of law on a motion for summary judgment if there is no dispute with regard to the pertinent events and knowledge of the officer." *Weinstock v. Wilk*, 296 F. Supp.2d 241, 256 (D. Conn. 2003) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 2003)).  "[U]nder both federal and state law, probable cause to search is demonstrated where the totality of the circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'"  *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Probable cause is to be assessed on an objective basis." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007).  The Second Circuit has consistently stated that:

> Courts should look to the totality of the circumstances and must be aware that probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules.

*Fabrikant,* 691 F.3d at 215 (citations omitted). "In assessing probabilities, a judicial officer must look to the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Walczyk*, 496 F.3d at 156 (internal quotation marks and citation omitted).  In sum, probable cause "requires only such facts as make wrongdoing or the discovery of evidence thereof probable." *Id.* at 157.

The Plaintiffs argue that the Officer did not have probable cause when they detained the Plaintiffs at 5:30p.m. because the warrants were not signed until 9:32p.m. and were not executed until 11p.m.   "Probable cause exists when [one] ha[s] knowledge of, or reasonably trustworthy information as to, facts and

circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Williams,* 535 F.3d 71, 79 (2d Cir. 2008) (internal quotation marks omitted). That is distinct from a judicial finding of probable cause prerequisite to the issuance of a warrant.  See *U. S. ex rel. Rogers v. Warden of Attica State Prison,* 381 F.2d 209, 216 (2d Cir. 1967) ("It is not the magistrate's function, therefore, merely to determine whether the official seeking the warrant believes that probable cause exists; rather, the magistrate must ask whether the facts presented persuade him that there is probable cause.").  A judicial finding of probable cause is only necessary where a warrantless search or seizure is impermissible. *See U.S. v. Moreno*, 701 F.3d 64, (2d Cir. 2012) ("It is well-settled, as we have repeatedly said, 'that the warrant requirement of the Fourth Amendment must yield in those situations in which exigent circumstances require law enforcement officers to act without delay'") (quoting *United States v. Gordils*, 982 F.2d 64, 69 (2d Cir. 1992)).

Even if probable cause was required, it is undisputed that the Detectives had probable cause when they arrived to secure the premises because the Waterbury Police Department discovered that the bank robberies were committed using vehicles, which were registered at the Seifert residence. [Dkt. # 20-3, Exhibit E, Aff. & Appl. for Search & Seizure Warrant, at 24].  Additionally, when the officers arrived at the Seifert residence earlier that day they observed one of the vehicles used my Michael Seifert in the robberies parked in the driveway. [Dkt. # 20-3, Exhibit D, Arrest Warrant Appl., at 20].  Lastly, the officers were

dispatched to the residence because Michael Seifert confessed to committing the robberies and informed the police that the bag, clothing, BB gun he used during the robberies were at his residence.   Based on these undisputed facts the totality of the circumstances indicated that there was a fair probability that evidence of Michael Seifert's crimes were to be found at the Seifert residence at the time Detectives Rivera and Borer arrived at the residence to secure the premises.

The undisputed facts also demonstrate that the second *McArthur* factor has been satisfied as the Defendants had good reason to fear that evidence would be destroyed before they could return with a warrant.  As discussed above in reference to the *Terry* stop analysis, when the Detectives arrived at the Seifert residence, they did not know whether any of the family members had participated or were complicit in the robberies.  Further, the Waterbury Police had earlier in the day spoken with Timothy and Laura Seifert seeking the whereabouts of their father and thus they were on notice that their father's scheme had been uncovered by the police.  On this basis, the Defendants had good reason to fear that members of the Seifert household would act to destroy the evidence needed to convict Michael Seifert of the robberies.  Furthermore as the two of the primary pieces of evidence sought by the police were the cars Michael Seifert had used to commit the string of robberies, the Police had good reason to fear that members of the Seifert family would abscond with one of the cars. [4]

---

[4] Indeed, the exigencies relating to searching automobiles has long been recognized as a permissible exception to the warrant requirement.  *See Carroll v. U.S.*, 267 U.S. 132, 153 (1925) ("[T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of Government, as recognizing a necessary difference

Third, the officers made reasonable efforts to reconcile their law enforcement needs with the demands of personal liberty and privacy of the Plaintiffs to satisfy the third *McArthur* factor by allowing the detainees virtually unfettered use of the property.  Here, the Defendants refrained from actually searching the residence for evidence until the warrants had been obtained.  They merely secured the residence to prevent the destruction of evidence by preventing the Plaintiffs from leaving the residence and from making any phone calls.  *See Legette*, 260 F. App'x at 251 ("The police here respected Legette's privacy needs by not arresting him nor fully searching the premises without a warrant").  Otherwise, the Plaintiffs were permitted to go about their normal routines at home without supervision from the Detectives who remained in the living room as Laura Seifert had asked.  Indeed, Laura Seifert cooked dinner while the officers sat in the living room.  [Dkt. # 24-1, Laura Seifert's Dep., at 16-17].  Linda Seifert was allowed to change her clothing and use the bathroom without supervision from the police officers. [Dkt. # 20-5, Exhibit M, Linda Seifert's Dep., at 16].  Timothy Seifert has access to and used the bathroom and kitchen. [Dkt. # 20-5, Exhibit L, Timothy Seifert's Dep., at 31].  Plaintiffs also watched a hockey

---

between a search of a store, dwelling house or other structure in respect of which a proper official warrant readily may be obtained, and a search of a ship, motor boat, wagon or automobile, for contraband goods, where it is not practicable to secure a warrant because the vehicle can be *quickly moved* out of the locality or jurisdiction in which the warrant must be sought.") (emphasis added);  *California v. Carney*, 471 U.S. 386, 391 ("The mobility of automobiles, we have observed, creates circumstances of such exigency that, as a practical necessity, rigorous enforcement of the warrant requirement is impossible.") (internal quotation marks and citations omitted).  Therefore, the Defendants' fear that the cars themselves and any evidence in the cars would be destroyed due to the inherent mobility of cars is substantiated by the long recognized "automobile exception" to the Fourth Amendment warrant requirement.

game in the family room while the officers waited in the living room. [Dkt. # 20-5, Exhibit Q, Pls.' Resp. to Def.'s Interrog. No. 5, at 60].  When the Plaintiffs asked if they could use the cars, the Officers explained that since the cars had been used in the robberies they had to be impounded as evidence.  Further, it is well established that property may be held for a brief time where there is reasonable suspicion that that it contains evidence of a crime.  *See United States v. Martin,* 157  F3d 46, 54 (2d Cir. 1998) (Property could be held 11 days pending issuance of a warrant where probable cause existed); *United States v. Ohio*, 494 U.S. 541, 542 (1990) (acknowledging that the "Fourth Amendment may permit a brief detention of property on the basis of only 'reasonable, articulable suspicion'").  The officers therefore balanced the competing interests of law enforcement and the demands of personal liberty and privacy of the Plaintiffs.  This balance is demonstrated by the fact that Timothy Seifert was allowed to remove his personal belongings from one of the cars that was going to be impounded as evidence.  Further, it was imminently reasonable for the Defendants to restrain the Plaintiffs from leaving the residence as all of their cars had been used in the robberies and were therefore evidence.  There is no evidence in the record that the Plaintiffs had other means of transportation that they could have utilized to leave the premises besides the cars which had been used in the robberies.

Fourth, the Defendants restrained the Plaintiffs only for the time period that the Police Department worked diligently to obtain the warrants.  The Plaintiffs were detained in their residence for approximately four hours prior to the Defendants obtaining the warrant and five and half hours prior to the execution of

the warrant at the residence.  Such a limited period of restraint was reasonable under the Fourth Amendment as there is no evidence that the Defendants unreasonably delayed or failed to diligently pursue obtaining the warrant.  *See Segura*, 468 U.S. at 812-13 (holding that a 19-hour home seizure while obtaining a search warrant was not *per se* unreasonable as half the delay occurred between 10 p.m. and 10 a.m. the following day "when it is reasonable to assume that judicial officers are not as readily available for consideration of warrant requests."); *Legette*, 260 F. App'x at 251 (finding that detention of four hours while warrant was obtained was reasonable under the Fourth Amendment); *U.S. v. Christie*, 570 F.Supp.2d 657, 668 (D.N.J. 2008) (finding pre-warrant detention of seven hours reasonable under the rationale of *McArthur*).

In sum, the restraints the Defendants imposed on the Plaintiffs in restraining them from leaving the residence and making phone calls as well as their conduct in waiting in the living room to secure the premises until the warrant was obtained was both limited and tailored reasonably to secure law enforcement needs while protecting the Plaintiffs' privacy interests.  These restraints could very well be seen as less restrictive then the restraint imposed in *McArthur* where the suspect was prevented from entering his residence at all unless accompanied by police officers.  In the present case, the Plaintiffs were not only permitted to remain in their residence but were allowed access to areas of the residence unaccompanied and unsupervised by the Detectives.  An examination of the *McArthur* factors indicate that the seizure of the Plaintiffs and their residence was reasonable under the Fourth Amendment as it struck a liberal

balance between privacy-related and law enforcement-related concerns favoring the Plaintiffs.  Further, the undisputed facts demonstrate that there was probable cause and the exigent need to prevent destruction of evidence which the Supreme Court in *Summers* and *Segura* has suggested would justify the imposition of minimal restraints on occupants of premises such as the ones imposed here to prevent the destruction of evidence while a warrant was obtained.  Lastly, the continued detention of the Plaintiffs after the warrant had been obtained and was being executed was clearly reasonable under *Summers* as the search warrant carried with it the "limited authority to detain the occupants of the premises while a proper search [was] conducted." *Summers,* 452 U.S. at 705.  As the seizure of the Plaintiffs and their residence was permissible under the Fourth Amendment, it was not unlawful and therefore cannot sustain a claim of false imprisonment.  The Court therefore grants summary judgment on the Plaintiffs' false imprisonment claim in favor of Defendants.

## III.    Qualified Immunity

Defendants also argue that they are entitled to the protection of qualified immunity as any reasonable officer would have believed their conduct was lawful.  When reviewing a claim of qualified immunity, a court must consider "whether the facts that the plaintiff has alleged (See Fed. Rules Civ. Porc. 12 (b)(b)(6), (c)) or shown (see Rule 50, 56) make out a violation of a constitutional [or statutory] right," and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Although previously the Supreme Court prescribed a mandatory two-step analysis, considering first the constitutional violation prong and then the clearly established prong, the Court has since recognized that this rigid procedure "sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case," as "[t]here are cases in which it is plain that a constitutional right is not established but far from obvious whether in fact there is a constitutional right." *Pearson*, 555 U.S. at 236-37. Thus, the Supreme Court has provided district courts with the discretion to decide the order in which the two prongs of the qualified immunity analysis are applied. *Id.* at 243. In providing the lower courts with the discretion to determine the order of qualified immunity analysis to be applied to a given case, the Supreme Court explicitly acknowledged that "there will be cases in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question of whether the relevant facts make out a constitutional question at all." *Id.* at 239.

Qualified immunity "protects government officials from liability where the officials' conduct was not in violation of a 'clearly established' constitutional right." *Sudler v. City of New York*, 11-1198-cv (L), 11-1216-cv (con), 2012 WL 3186373, at *10 (2d Cir. Aug. 7, 2012). "If the conduct did not violate a clearly established constitutional right, or if it was objectively reasonable for the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity." *Id.* (quoting *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011)). "Qualified immunity thus shields government officials from

liability when they make 'reasonable mistakes' about the legality of their actions, and 'applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal citations omitted) (quoting *Pearson*, 555 U.S. at 231).

Here, the Court agrees that the Defendants would be entitled to the protections of qualified immunity for both the Plaintiffs' unlawful entry and false arrest claims.   For the reasons already discussed, it was objectively reasonable for the Defendants to believe they have been given consent to enter and therefore an objectively reasonable officer would believe his actions in entering a premise with consent did not violate the Fourth Amendment.   Even if the Defendants made a mistake of fact as to whether consent had been given, qualified immunity would still shield them for making such a reasonable mistake of fact.   Furthermore, it was objectively reasonable for the officers to believe that exigent circumstances made their entry lawful.   At the point the Defendants departed to the Seifert residence all of the facts regarding the numerous bank robberies had not surfaced and Michael Seifert was still in the process of giving his voluntary statement.   Given Michael Seifert's use of his family's vehicles to commit the robberies it was reasonable for the officers to believe that the family members were complicit in the crimes and therefore justified the need to prevent the destruction of the evidence.   The Defendants are therefore entitled to qualified immunity on the Plaintiffs' unlawful entry claim.

The Defendants are likewise entitled to qualified immunity on the Plaintiffs' false arrest claim.   It is not clearly established that imposing minimal restraints

upon occupants of a premises, on the basis of probable cause, to prevent them from destroying evidence while seeking a warrant is a violation of the Fourth Amendment in view of the Supreme Court's decisions in *Terry, Summers, Segura*, and *McArthur*.   Consequently, an objectively reasonable officer would believe his conduct did not violate the Plaintiffs' constitutional rights particularly where the Supreme Court in *Summers* indicated that "comparable police conduct [detaining resident incident to search] may be justified by exigent circumstances in the absence of a warrant." 452 U.S. at 702 n. 17.  See *Lane v. Manning*, No.4:08-cv467-A, 2009 WL 1097832, at *3 (N.D.Tex. April 21, 2009) (holding that officers entitled to qualified immunity where plaintiff claimed that the officers detained him for hours before obtaining a search and arrest warrant as officers of reasonable competence could differ on the lawfulness of the defendant's action in view of the Supreme Court's decisions in *Summers* and *Segura*).  The Court therefore finds that the Defendants are also entitled to qualified immunity on the Plaintiffs' false arrest claim.

IV.     Negligent Infliction of Emotional Distress

Lastly, the Defendants argue the summary judgment should be granted in their favor on Plaintiffs' negligent infliction of emotional distress claim as it is barred by the applicable statute of limitations.  The Plaintiffs concede that they have brought their claim outside of the limitations period, but have not withdrawn the claim and therefore the Court grants summary judgment on this claim as well.

**Conclusion**

For the foregoing reasons, the Court GRANTS Defendants' [Dkt. #20] motion for summary judgment on all of the Plaintiffs' claims.  The Clerk is directed to enter judgment in favor of the Defendants and close the case.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 19, 2013